278 F.2d 858
 LOCAL NO. 636, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF PLUMBING AND PIPE FITTING INDUSTRY OF UNITED STATES AND CANADA, AFL-CIO, et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 15012.
 United States Court of Appeals District of Columbia Circuit.
 Argued February 8, 1960.
 Decided March 31, 1960.
 
 Mr. Martin F. O'Donoghue, Washington, D. C., with whom Messrs. Thomas X. Dunn and Patrick C. O'Donoghue, Washington, D. C., were on the brief, for petitioners.
 Mr. Norton J. Come, Deputy Asst. Gen. Counsel, National Labor Relations Board, with whom Messrs. Thomas J. McDermott, Associate Gen. Counsel, National Labor Relations Board, and Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, were on the brief, for respondent.
 Messrs. Charles B. McInnis and G. Kibby Munson, Washington, D. C., filed a brief on behalf of Nat. Constructors Ass'n, as amicus curiae, urging reversal.
 Messrs. George H. Meyer, Detroit, and David W. Peck, New York City, filed a brief on behalf of Detroit Edison Co., as amicus curiae, urging enforcement of the Board's order.
 Before EDGERTON, WILBUR K. MILLER and BASTIAN, Circuit Judges.
 BASTIAN, Circuit Judge.
 
 
 1
 This case is before us on petition of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO, its Local 636, and Business Agent Tim McCarthy and President William B. Kelley of that Local (hereinafter referred to as petitioners), to review and set aside an order of the National Labor Relations Board (hereinafter referred to as the Board) issued against them on March 16, 1959. The Board filed a cross-petition asking enforcement of its order.
 
 
 2
 The material facts, as they appear in the examiner's findings and in the Board's final order, are not in dispute.
 
 
 3
 Since 1947, United Engineers & Constructors Inc. (hereinafter referred to as United Engineers) and petitioner United Association have been parties to a collective bargaining agreement known as the National Construction Agreement. The agreement provides, among other things, that United Engineers will hire all its pipefitters through Local 636; that all pipe 2½ inches in diameter or less must be fabricated, that is, cut, bent and welded, on the job site; and that all pipe of greater diameter may be fabricated off the job site if the work be done in a plant employing Journeymen of United Association at the prevailing building construction wage rates in effect.
 
 
 4
 The action of the Board grew out of charges filed by The Detroit Edison Company (hereinafter referred to as Edison), a public utility engaged in the generation, sale and distribution of electrical energy within the State of Michigan, and Westinghouse Electric Corporation (hereinafter referred to as Westinghouse), which is engaged in, among other things, the manufacture, distribution and sale of electrical products. The charges resulted in the issuance of a complaint by the Board, dated April 16, 1957, alleging that petitioners herein had engaged and were engaging in unfair labor practices within the meaning of § 8(b) (4) (A)[1] and other sections of the National Labor Relations Act, as amended, 61 Stat. 136 (1947).
 
 
 5
 The complaint, as amended, alleged that commencing on or about January 21, 1957, petitioners engaged in and induced and encouraged employees of United Engineers and others, at Edison's construction projects at River Rouge, St. Clair and Monroe, Michigan, to engage in a strike or concerted refusal in the course of their employment to handle or work on materials or perform services, with an object of forcing or requiring United Engineers to cease doing business with Westinghouse and with Edison.
 
 
 6
 As a result of the complaint, hearings were held during the period from June 3 to July 2, 1957, at Detroit, Michigan, and, as a result of those hearings, the above mentioned order of the Board was issued, directing petitioners to:
 
 
 7
 "1. Cease and desist from:
 
 
 8
 "(a) Engaging in a strike, and inducing or encouraging the employees of United Engineers and Constructors, Inc. or of any other employer or person, to engage in a strike or concerted refusal in the course of their employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services for their employers, where an object thereof is to force or require United Engineers and Constructors, Inc. or any other employer or person, (1) to cease purchasing, using, handling, transporting, or otherwise working on or dealing in materials fabricated by Westinghouse Electric Corporation or by any other employer or person who does not employ Building Trades Journeymen and Apprentices for the fabrication of said materials under an agreement with United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO, or its affiliated Locals, or (2) to cease doing business with the employers or persons mentioned in (1) above or with The Detroit Edison Company;
 
 
 9
 "(b) Engaging in a strike, and inducing or encouraging the employees of United Engineers and Constructors, Inc., or of any other employer or person which is a signatory to the National Construction agreement or any other such agreement with United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO, to engage in a strike or concerted refusal in the course of their employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services for their employers, by refusing, upon request of such employers, to refer members of Local 636, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO, for work with said employers, for the objects described in (a) above."
 
 
 10
 The order further directed petitioners, among other things, to take the following affirmative actions:
 
 
 11
 "2. * * * (a) Notify the members of said Local that Respondents have no objection to their installing or otherwise handling piping at any project of The Detroit Edison Company within the territorial jurisdiction of said Local which has been prefabricated by any employer with employees who are not members of Respondent Unions;[2]
 
 
 12
 "(b) Notify the members of said Local that any previous instructions, requests or appeals which Respondents have made against installing or otherwise handling piping at projects of The Detroit Edison Company within the territorial jurisdiction of said Local, which piping was prefabricated by employees who are not members of Respondent Unions, have been withdrawn, and that the `fabrication' clauses in the National Construction Agreement or any other such agreement with United Engineers and Constructors, Inc., or any contractor retained by The Detroit Edison Company to erect turbine units at projects within the Local's jurisdiction, do not prohibit or otherwise preclude any member of said Local from installing or otherwise handling prefabricated piping which does not satisfy the terms of those clauses;
 
 
 13
 "(c) Notify the members of said Local that Respondent will not discipline, penalize, or otherwise discriminate against any member for working on prefabricated piping at The Detroit Edison Company's aforementioned projects which contravenes the terms of the `fabrication' clauses * * *"
 
 
 14
 In 1947 United Engineers was first engaged by Edison as general contractor in the construction of power plants. In 1956, as part of an expansion program, Edison entered into a contract with United Engineers for the construction of generating units at River Rouge, Michigan, among other places. Under the contract, the basic responsibility for the construction was upon United Engineers. This consisted of furnishing skilled labor, and supervising the handling and erection of a turbine generator. Under the National Construction Agreement, United Engineers hired all workmen directly through Local 636 and billed Edison for such cost. Edison retained sole control over the purchase of all material and equipment for the project and made the decision as to what portion of the work was to be performed by United Engineers. If subcontracts were let, the administration of the contracts was turned over to United Engineers to see that time, quality and performance was in accordance with its contract with Edison. In no event did Edison have any employees engaged in manual or physical work on any project in which United Engineers was General Contractor.
 
 
 15
 It was always Edison's policy to purchase material and equipment from vendors offering the best value, without regard to the union affiliation of the vendor. In accordance with that policy, one of the turbine generators for the River Rouge project was purchased from Westinghouse, whose employees are associated with a union other than the petitioner union.
 
 
 16
 On January 21, 1957, a portion of the prefabricated pipe purchased from Westinghouse arrived at the River Rouge job site and, in the normal course of events, it would have been unloaded. The following morning, the Business Agent of Local 636 told the construction manager of United Engineers that the pipe was in violation of the "fabrication clause" of the National Construction Agreement in that Westinghouse did not employ journeymen of petitioner union, and that because of this violation the pipe would not be unloaded or handled.
 
 
 17
 On January 24, 1957, an international organizer of the petitioner union arrived at the job site in an attempt to resolve the difficulties. From the extended conversations between representatives of the union and members of United Engineers, it is clear that the primary cause for refusing to unload or handle this shipment of pipe was the union's concern over Edison's acceptance of bids on the fabrication of power piping for another project from a concern which did not have a contract with the petitioner union.
 
 
 18
 Further conversations were had between the above mentioned parties, but to no avail. From January 21 to January 28, 1957, certain work was performed on the Westinghouse turbine, none of which, however, involved the pipe in question. On this latter date all work ceased on Westinghouse material, with the explanation that no further work would be performed until the dispute was settled. On January 30, 1957, the union agreed to unload the pipe but refused to perform any work on the material.
 
 
 19
 From approximately January 28 to March 12, 1957, United Engineers unsuccessfully attempted to persuade Edison, in order to resolve the dispute, to revise its purchasing policy to conform to the "fabrication clause" contained in the National Construction Agreement.
 
 
 20
 On March 12, 1957, the general superintendent for United Engineers at River Rouge instructed the president of Local 636 (who was also United Engineers' piping foreman) to order his pipefitters to install the Westinghouse pipe. The request was refused on the ground that no further work would be performed until an agreement was reached regarding the pipe. Subsequently, in the presence of the president of the local, the general superintendent instructed other pipefitters to commence work. This they refused to do, on the ground that they would resume work only upon orders from the union. Certain of these pipefitters were cautioned by the president of the local not to assign any reasons for refusing to work but merely to say that they would handle the pipe "in the near future."
 
 
 21
 On March 13, 1957, the General Superintendent again contacted approximately 80 pipefitters and submitted the following questions to them:
 
 
 22
 "(1) We want you to erect the Westinghouse pipe — Will you do it?
 
 
 23
 "(2) If not, why?
 
 
 24
 "(3) If the union OK's it will you erect the Westinghouse pipe?"
 
 
 25
 All answered the first question in the negative. Response to the second question, though varied, was in substance that they would perform the requested work only if approval was given by the business agent or foreman of the Local or the union. The third question was answered uniformly in the affirmative.
 
 
 26
 On the same day, due to the continued refusal by the pipefitters on the job to handle the Westinghouse pipe, United Engineers' construction manager contacted the Local's business agent and ordered 12 men and a foreman (not already on the job) to be sent to perform this work. The following day, March 14, a letter confirming this request was sent to the business agent. Neither of these requests was honored. On April 16, 1957, due to the pressure of a suit for breach of contract filed by the union against United Engineers, the letter of March 14 was withdrawn.
 
 
 27
 Though negotiations were continued, no fruitful results were forthcoming until May 10, 1957. On that day, during the course of a hearing in the United States District Court for the Eastern District of Michigan on the Board's petition for a temporary restraining order against petitioners, the union instructed pipefitters of Local 636 to commence work on the pipe in question. On May 17, 1957, the District Court entered an order granting temporary injunction against Local 636.
 
 
 28
 As a result of a meeting held May 20, 1957, between United Engineers and the petitioner union, a memorandum of agreement was executed in which the union agreed, through Local 636, to furnish the necessary men to complete the project at River Rouge and United Engineers agreed not to request pipefitters from the union or any of its locals for the St. Clair project and not to request any subcontractors on that job to do so. United Engineers further agreed not to transfer pipefitters from River Rouge to St. Clair until United Engineers could assure the union that Edison would abide by the fabrication clause of the National Agreement, that is, limit its purchases of pipe to shops manned by United Association men. A copy of this agreement was transmitted to Edison and, as a result, Edison cancelled its contract with United Engineers at St. Clair on June 11, 1957.
 
 
 29
 The Board found that § 8(b) (4) (A) was violated by the union's action in inducing employees of United Engineers to strike in the course of their employment, and that the object of this refusal to work was to force United Engineers to assist in the union's dealings with Edison and to force Edison, in turn, to stop doing business with Westinghouse. The order of March 16, 1959, above referred to was thereupon entered by the Board.
 
 
 30
 The section in question is aimed at so-called secondary boycotts and is not intended to apply to primary activities. So the question here is whether United Engineers was, as the Board found, a neutral or secondary employer and the innocent target of the union's dispute with Edison and Westinghouse or whether, as the union contends, the underlying dispute was with United Engineers. The answer to those questions depends upon an appraisal of all the facts.
 
 
 31
 United Engineers did not become the primary employer merely because allowing prefabricated pipe on the job was a violation of the terms of the agreement between it and the union. The question is whether the contract provisions in question extend beyond the employer and are aimed really at the union's difference with another employer.
 
 
 32
 The Board was amply justified in concluding that the real targets of the controversy were Edison and Westinghouse, that they were the targets of the union's dispute, and that United Engineers was, as the employer in the typical secondary boycott situation, powerless to end the dispute except by breaking off business relations with Edison.
 
 
 33
 The record shows that working conditions of the pipefitters had little to do with the dispute. United Engineers did not purchase the pipe; it merely furnished the labor. The material was purchased and supplied by Edison. Edison purchased a "single package," the turbine and the connecting pipe, from Westinghouse, whose employees, though unionized, were not members of the petitioner union. The turbine and pipe were then delivered to the job site and the task of United Engineers was largely one of assembling the prefabricated parts.
 
 
 34
 There can be no doubt on the facts above related, which are entirely undisputed, that the union was engaging in a strike for the purpose of affecting an employer other than the primary employer.
 
 
 35
 Petitioners contend that the dispute was a primary dispute arising out of a violation of the fabrication clause of the National Agreement, which petitioners claim was a contractual provision pertaining to the direct employment relations of United Engineers and its pipefitter employees.
 
 
 36
 There is ample evidence in the record to support the Board's finding that the actions of the union were motivated by a desire to force United Engineers to cease doing business with Edison and, thereby, to force the latter to stop buying prefabricated pipe from Westinghouse.
 
 
 37
 These intentions are clearly evidence in statements made by the union's general organizer to the effect that the basis of United Engineers' violation of the National Agreement was the fact that Westinghouse pipe was fabricated in a shop not manned by members of petitioner union, and that the union was not as concerned about the members working on Westinghouse pipe as it was about the fact that Edison was accepting bids for piping contracts on another job from a company not under contract with United Association. This organizer made it clear that the union's primary concern was Edison's policy of not confining its purchases to pipe fabricated in plants under contract with United Association.
 
 
 38
 In National Labor Relations Board v. Denver Bldg. & Const. Trades Council,[3] the Supreme Court stated:
 
 
 39
 "At the same time that §§ 7 and 13 safeguard collective bargaining, concerted activities and strikes between the primary parties to a labor dispute, § 8(b) (4) restricts a labor organization and its agents in the use of economic pressure where an object of it is to force an employer or other person to boycott someone else."
 
 
 40
 Thus, in the case here, the union was in fact using "economic pressure," under the guise of a dispute with United Engineers, with an object to force Edison to refrain from purchasing pipe not fabricated in United Association shops.
 
 
 41
 The Court further stated in the Denver Bldg. & Const. Trades Council case:[4]
 
 
 42
 "It is not necessary to find that the sole object of the strike was that of forcing the contractor to terminate the subcontractor's contract. This is emphasized in the legislative history of the section." [Emphasis in original text.]
 
 
 43
 The rule is thus stated in National Labor Relations Board v. Wine, Liquor & Distillery Workers Union:[5]
 
 
 44
 "It is not a defense that other motives may have entered into the action of the respondent. Section 8(b) (4) (A) forbids a work stoppage by the union when `an object thereof' is to require the employer to cease dealing in the products of another."
 
 
 45
 Since it is apparent from the record in the present case that at least one of the purposes, and the primary purpose at that, for instigating the dispute was to exert economic pressure upon Edison, a secondary party, it is immaterial that other purposes may also have been present.
 
 
 46
 Petitioners' contention that the Board erroneously concluded that the conduct of Kelley, general foreman and president of the local, on March 12 and 13 induced or encouraged employees within the meaning of § 8(b) (4) (A) is clearly without foundation, as the episodes of March 12 and 13 hereinbefore set forth demonstrate. Throughout this period of questions and answers of the 80 pipefitters, the local's president remained silent, which silence we feel, together with the positive statements made the previous day, was tantamount to encouragement and inducement to the members to refrain from handling the pipe.
 
 
 47
 As the Supreme Court stated in International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, 1951, 341 U.S. 694, 701-702, 71 S.Ct. 954, 958, 95 L.Ed. 1299:
 
 
 48
 "The words `induce or encourage' are broad enough to include in them every form of influence and persuasion. There is no legislative history to justify an interpretation that Congress by those terms has limited its proscription of secondary boycotting to cases where the means of inducement or encouragement amount to a `threat of reprisal or force or promise of benefit.' Such an interpretation would give more significance to the means used than to the end sought."
 
 
 49
 However, we think the Board's order is too broad in two respects:
 
 
 50
 1. We think it should apply only to conduct in relation to United Engineers and Constructors, Inc., and should not extend to relations with "any other employer." International Brotherhood of Teamsters, etc., Local No. 554, AFL-CIO v. National Labor Relations Board, 104 U.S.App.D.C. 359, 365, 262 F.2d 456, 460, 462; International Union of Operating Engineers, Local 150 v. National Labor Relations Board, 107 U.S.App. D.C. 19, 273 F.2d 833. Paragraph 1(a) of the order should therefore be modified by inserting in line 1, after "Engaging in a strike," the words "against United Engineers and Constructors, Inc.," and by deleting the words "or of any other employer or person." Similarly, in Paragraph 2(b), the words "or any contractor retained by The Detroit Edison Company" should be deleted; and in Paragraph 2(c), the words "The Detroit Edison Company's" should be deleted, and the words "of United Engineers and Constructors, Inc." should be inserted after "projects."
 
 
 51
 Paragraph 2(a) of the Board's order should likewise be deleted.
 
 
 52
 2. As the Board recognizes in its brief (p. 43), "both the terms `strike' and `concerted refusal in the course of employment,' set forth in Section 8(b) (4) (A), would appear to restrict its application to situations where there is an employment relation between the employees who the union has induced and an employer." See Joliet Contractors Ass'n v. National Labor Relations Board, 7 Cir., 1953, 202 F.2d 606, 609. We think there was no employment relation between United Engineers and men who had done no work for that employer and had not even been referred to that employer. Paragraph 1(b) of the Board's order, which is directed at "refusing, upon request of such employers, to refer members of Local 636," should therefore be deleted.
 
 
 53
 The Board's order, as thus modified, will be enforced.
 
 
 
 Notes:
 
 
 [1]
 At the time of the filing of the charges by Edison, § 8(b) (4) (A) (29 U.S.C.A. § 158(b) (4) (A) read as follows:
 "§ 8(b). It shall be an unfair labor practice for a labor organization or its agents — * * *
 "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person. * * *"
 Since that time, this section has been amended by the Labor-Management Reporting and Disclosure Act of 1959 (73 Stat. 519).
 
 
 [2]
 The Board is not seeking enforcement of paragraph 2(a)
 
 
 [3]
 1951, 341 U.S. 675, 687, 71 S.Ct. 943, 951, 95 L.Ed. 1284
 
 
 [4]
 Id., 341 U.S. at page 689, 71 S.Ct. at page 952
 
 
 [5]
 2 Cir., 1949, 178 F.2d 584, 586, 16 A.L.R.2d 762