**AMERICAN FEDERATION OF MUSICIANS and its Local Union No. 174, Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Loyola University, Intervenor.

No. 19418.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 13, 1966.

Decided Feb. 11, 1966.

Mr. George Kaufmann, Washington, D. C., with whom Messrs. Henry Kaiser and Warren Woods, Washington, D. C., were on the brief, for appellants.

Mr. Ronald A. Siegel, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and John H. Conlin, Associate General Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Robert A. Marmet, Washington, D. C., with whom Mr. Edwin R. Schneider, Jr., Washington, D. C., was on the brief, for intervenor.

Before DANAHER, McGOWAN and TAMM, Circuit Judges.

TAMM, Circuit Judge.

This is an appeal by the American Federation of Musicians and its New Orleans' Local No. 174 [hereafter collectively referred to as AFM] from a May 13, 1965 order of the Federal Communications Commission.[1] Loyola University, holder of the license to operate WWL–TV, channel 4, New Orleans, the retention of which the appellants have called into question, has intervened in these proceedings.

The controversy presently before this court finds its genesis in a 1952 construction permit application filed by Loyola University, requesting authority to construct a commercial television station on channel 4, New Orleans, Louisiana. Subsequently two other parties filed like applications. A "comparative hearing" was held which ultimately culminated in the granting of the permit to Loyola. Loyola University, et al., 12 Pike & Fischer, R.R. 1017 (1956), rehearing denied, 12 Pike & Fischer, R.R. 1116a (1957), aff'd sub nom. Noe v. Federal Communications Commission, 104 U.S.App.D.C. 221, 260 F.2d 739 (1958), cert. denied, 359 U.S. 924, 79 S.Ct. 607, 3 L.Ed.2d 627 (1959).

Among the subjects considered by the Commission in reaching its decision was that of "local live programming," including local live musical programming. In its application and during the comparative hearing, Loyola presented its programming plans, including its proposal to broadcast live programs utilizing local musical talent. Members of the AFM Local voluntarily supported the application by aiding Loyola in the preparation and production of various musical programming proposals. The Commission's final decision granting the application to Loyola did not accord it any preference over the other applicants on the basis of its programming proposals.[2]

Loyola commenced operation of station WWL-TV on September 6, 1957, received a license to cover its construction permit on March 5, 1959, and on March 3, 1961, filed its first license renewal application. On April 25, 1961, AFM filed a petition to deny the renewal application, pursuant to Section 309(d) (1) of the Communications Act of 1934, 48 Stat. 1085, as amended, 47 U.S.C. § 309(d) (1) (1964).[3]

---

1. Loyola University, 5 Pike & Fischer, R.R.2d 239.

2. Loyola did establish preferences over the other applicants on the basis of its past record of performance in the operation of standard broadcast station WWL, as well as on the issue of diversification of media of mass communication. Although there appears to be some controversy among the parties on the question, it is clear from the record that the preference for *local live programming* did not go to Loyola, but rather to one of its competitor-applicants, the Times-Picayune Publishing Co., 12 Pike & Fischer, R.R. 1104–1106.

3. "§ 309(d) (1) Any party in interest may file with the Commission a petition to deny any application (whether as originally filed or as amended) to which subsection (b) of this section applies at any time prior to the day of Commission grant thereof without hearing or the day of formal designation thereof for hearing; except that with respect to any classification of applications, the Com-

Appellants' petition to deny raised a question of "promise versus performance," *id est,* whether Loyola's actual operation with respect to its broadcast of live programs (particularly live musical programs) during the preceding license period conformed to the program proposals set forth in its original construction permit application. AFM contended that Loyola had represented in its 1952 application and at the comparative hearing that it would devote 24.27% of its broadcast time to local live programming, while in the license period it actually devoted only 11.6% of its broadcast time to such programs. It was further asserted that whereas Loyola had promised 38 local live programs using community talent, 13 of which would use musical talent, including a staff orchestra, Loyola never in fact employed a staff orchestra, and actually hired only one staff organist in the entire period, and that he was released early in the license period.

Loyola's promise for the future in its 1961 renewal application was that it would provide 17.3% live programming. AFM made no showing that the projected programming proposals contained in the 1961 renewal application were contrary to the public interest.

On December 17, 1962, the Commission unanimously decided to dismiss AFM's petition to deny on the ground that the union lacked standing as a "party in interest" within the meaning of that term as used in the Communications Act.[4] Nevertheless, the Commission, on its own motion, considered the merits of the petition as well as the station's overall programming performance. On the basis of its independent review and inquiry into Loyola's past programming proposals and its overall programming performance, the Commission found a "substantial variance" between the previous programming proposals and the actual performance during the license period. Accordingly, the Commission held that a short-term grant for a period of one year, instead of the normal three-year term, would best serve the public interest. It noted that its decision was based on the station's overall performance in rendering a diversified program service, and was not grounded on any one aspect of its programming. The unions did not request the Commission to reconsider its decision nor did they seek judicial review of the Commission's final order.[5]

On September 3, 1963, Loyola filed its second license renewal application, the grant of which is being challenged by this appeal. AFM again filed a petition to deny. On May 12, 1965, the Commission unanimously granted the application of Loyola University for renewal of the license and dismissed AFM's petition to deny.[6] The Commission again

mission from time to time by rule may specify a shorter period (no less than thirty days following the issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereof), which shorter period shall be reasonably related to the time when the applications would normally be reached for processing. The petitioner shall serve a copy of such petition on the applicant. The petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with subsection (a). Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowl-

edge thereof. The applicant shall be given the opportunity to file a reply in which allegations of fact or denials thereof shall similarly be supported by affidavit."

4. Loyola University, 24 Pike & Fischer, R.R. 766.

5. Appeals may be taken from decisions and orders of the Commission to this court: "(6) By any other person who is aggrieved or whose interests are adversely affected by *any* order of the Commission granting or denying any [renewal] application * * *." 47 U.S.C. § 402(b) (6). See also 47 U.S.C. § 405.

6. Loyola University, 5 Pike & Fischer, R. R.2d 239.

held that AFM failed to meet the standard necessary to confer standing as a "party in interest." Notwithstanding the lack of standing finding, the Commission, on its own motion, again considered the merits of the petition to deny. On the basis of its review of the record, it held that Loyola had substantially complied with the live programming proposals contained in the 1961 application (17.3% promise versus 16.14% performance). The Commission determined that a grant of the renewal application for the full three-year term would serve the public interest, since Loyola had satisfactorily resolved the promise versus performance question which had previously resulted in the limited one-year grant.

The issues which the parties have stipulated to on this appeal are: (1) Does AFM have standing to file a petition to deny Loyola's license, id est, are they "parties in interest" within the meaning of Section 309(d)(1) of the Communications Act? (2) Did the Commission err in refusing to designate for an evidentiary hearing Loyola's 1963 renewal application pursuant to Section 309 of the Communications Act?

AFM's position on the standing issue is, in summary, that it is a "party in interest" because it has a direct and substantial economic interest in the employment of musicians by television stations in their live presentations; that this economic interest has been injured by Loyola's failure to program more live music and to use union musicians to the degree that it had promised; and that this economic interest is "plainly sufficient" to qualify the unions to participate in administrative proceedings. The unions also urge that they properly represent the public interest in local, live musical programming and this suffices as an additional basis to support a "party in interest" finding. With respect to the question of the holding of an evidentiary hearing, AFM argues that the

record presented "substantial and material questions of fact" and that the public interest would be served by the holding of a hearing.

Both the Commission and intervenor argue that appellants' economic interest in the employment of professional musicians is not sufficient to confer standing, that the legislative history of the amendments to the Communications Act clearly negatives appellants' "representative of the public interest" argument,[7] that there were no "substantial and material questions of fact," and consequently that no hearing was required.

■ Although this case presents some interesting and intriguing questions which were briefed extensively with much skill by all counsel concerned, the judicial function is best served, we believe, when appellate decision, after appropriate review, is limited to only those questions necessary to decide the case (except, of course, in extraordinary circumstances, which we do not find here). Accordingly, we confine our consideration to the limited questions of whether appellants, by their failure to seek review of the Commission's 1962 decision and order granting the one-year renewal, waived their right to complain at some later date about errors they may have believed to exist at that time, or whether, in any event, the Commission erred in failing to direct that an evidentiary hearing be held.

In order to properly decide the first question, it is necessary to consider it in the factual context within which it arose. In its 1962 decision granting Loyola the limited one-year renewal, the Commission noted "substantial deviations in your record of program representations and performance."[8] The Commission found that Loyola's attempt to "upgrade" its programming at renewal time in an effort to improve its performance posture did not obviate the serious questions raised by the substantial deviations

7. E. g., H.R.Rep.No. 1800, 86th Cong., 2d Sess. 10 (1960), U.S.Code Cong. & Admin. News 1960, p. 3516.

8. 24 R.R. at 768.

found. The Commission determined that extraordinary action was necessary to rectify the disparities and therefore granted the limited one-year renewal.

That appellants were put to a difficult policy decision by the Commission's decision is abundantly clear. In essence, this decision was whether to seek review immediately, attempting to set aside both the no-standing finding and the one-year grant made without evidentiary hearing, or to adopt a "wait and see" position and file another petition to deny if the promise versus performance rating did not improve.[9] Appellants certainly must have been aware of the risk inherent in such an approach, *id est,* that Loyola's performance might improve substantially to the point where the Commission would grant a full three-year license renewal, but that this still might not be satisfactory performance from the point of view of the unions, especially in view of the earlier promises. In point of fact, this is precisely what happened, Loyola's performance percentage rising to 16.14% compared to its 1961 renewal promise of 17.3%.[10]

Appellants attempt to overcome this problem by arguing that the post-1961 performance should not be compared to the 1961 promise, but rather, that Loyola should be held to its 1952 construction application promise of 24.27% live pro-

9. Appellants now say that it was their willingness to give Loyola another chance that excuses their failure to seek review of the one-year renewal order. But this hardly squares with a realistic view of appellants' interest. That interest has only an incidental relationship to live local programming in the abstract. It is rather—and very properly so in view of appellants' organizational purposes—an interest in live local programs using paid professional musicians. This is clear from appellants' statement in the supplement to the petition to deny that "its [intervenor's] use of any local musical talent seems to be limited to amateurs appearing on special programs * * *. Despite its promises at a comparative hearing which were relied on by the Commission in granting it a construction permit, [intervenor] still does not employ any professional musicians." And, in the reply to intervenor's opposition, appellants summed up their grievance in these terms: "Despite its promises to the Commission, [intervenor] has not, in fact, used and paid local, live professional musicians to produce local, live musical programs."

This was the gravamen of appellants' complaint when they sought to intervene at the time Loyola's license first came up for renewal. There was no question then that there was a gap between intervenor's promise and its performance with respect to live programs using professional musicians. There was equally no question as to intervenor's program intentions for the future if its license were renewed, whether for one year or three. Those intentions did not include the use of professional musicians in local, live musical programs. This was apparent throughout the renewal proceedings, for intervenor sought to justify its failure to use professional musicians as a deliberate judgment, arrived at in terms of effective programming and business practicalities.

Thus, when the one-year renewal order was forthcoming, appellants had no reason to think that the probationary period would see any improvement in the situation *vis-a-vis* professional musicians. Indeed, what appellants isolate as indicating a variance between promise and performance are the original representations as to professional musicians made by intervenor at the time it obtained its construction permit. The Commission apparently regarded that precise issue as over the dam and, at the next renewal hearing, did not expect to measure intervenor's performance by reference to its use of professional musicians. It was then that appellants' interest, as a matter of practical effect, was most sharply in conflict with the Commission's action; and it was then that appellants most appropriately should have pressed their claim that that interest was entitled to recognition as a matter of law.

10. As noted, Loyola had begun upgrading its program performance shortly before filing the application for license renewal. Since the grant was limited to a one-year period, and not the theretofore almost automatic three-year renewal, appellants should have foreseen that Loyola would not allow this valuable broadcast asset to be placed in further jeopardy, but that Loyola would heed the warning implicit in the limited grant by bringing its promise versus performance percentages more into line.

gramming. If such a figure were used, there would then be a difference of 16.14% performance as compared to 24.27% promise, a deviation of a much more serious magnitude.

In considering the case on the merits in 1965, the Commission determined to renew Loyola's application for a full three years, finding that

"on the basis of over-all program performance, and in the absence of a question of substantial variance between program performance and the program proposals *in the 1961 application for renewal* we today granted the application of Loyola University * * *." 5 R.R.2d at 240. (Emphasis added.)

Appellants would have us reverse the Commission's determination to utilize the 1961 promise figures, and require that Loyola be strictly held to its earlier promises. This court, however, is not persuaded to adopt such a course.

▮ We hold that by failing to seek review of the 1962 decision, appellants are now foreclosed from asserting the 1952 promise percentages as the basis for comparison with the post-1961 performance figures. In so holding, we note that appellants' situation is not unlike that of the appellant in Colorado. Radio Corp. v. F. C. C., 73 App.D.C. 225, 227, 118 F.2d 24, 26 (1941), wherein we stated:

"We cannot allow the appellant to sit back and hope that a decision will be in its favor and then, when it isn't, to parry with an offer of more evidence. No judging process in any branch of government could operate efficiently or accurately if such a procedure were allowed."

And compare Albertson v. F. C. C., 100 U.S.App.D.C. 103, 105, 106, 243 F.2d 209, 211, 212 (1957).

Appellants had an opportunity available to them in 1962 to seek review of

the case as it then stood, including the question of their status as a "party in interest." [11] Failing that, appellants are now bound by events which have transpired since that time. Cf. WLIL, Inc. v. F. C. C., 122 U.S.App.D.C. ——, 352 F.2d 722 (1965); Valley Telecasting Co. v. F. C. C., 118 U.S.App.D.C. 410, 336 F.2d 914 (1964); Springfield Television Broadcasting Corp. v. F. C. C., 117 U.S. App.D.C. 214, 328 F.2d 186 (1964).

▮ The other question posed for our consideration—whether the Commission erred in failing to order an evidentiary hearing pursuant to Section 309— is similarly without merit. This question falls clearly within that area where

"customary deference [is given] by us to the Commission's judgments so long as they are supported by substantial evidence of record." Deep South Broadcasting Co. v. F. C. C., 120 U.S.App.D.C. 365, 347 F.2d 459, 460 (1965) (dictum). South Florida Television Corp. v. F. C. C., 121 U.S. App.D.C. 293, 295, 349 F.2d 971, 973 (1965).

As previously noted, Section 309 of the Communications Act specifies that an application may be granted without hearing unless "a substantial and material question of fact is presented," or the Commission is otherwise unable to find that a grant would serve the public interest, convenience or necessity.

On the basis of our review of the record in this case, we do not find any substantial or material questions of fact, nor can we say that the Commission's decision does not "serve the public interest, convenience, or necessity." To so find would be to hold that the unions should be rewarded for their dilatoriness and that Loyola should be held strictly in the period after 1961 to its promises made in 1952. Such an approach ignores the fact that change in station programming really

---

11. Since it is not necessary to decide, under our disposition of the case, the question of appellants' standing, we neither meet nor intimate determination of such

question. *Cf.* Boston Tow Boat Co. v. United States, 321 U.S. 632, 634, 64 S.Ct. 776, 88 L.Ed. 975 (1944).

"points up the impracticability of expecting an applicant to give absolute assurance that some several years after filing of its application it will effect the exact operation originally proposed." WJR, The Goodwill Station, Inc., 16 Pike & Fischer, R.R. 321, 351.

Static and unchanging programming policies are not necessarily a good thing for the "public interest, necessity and convenience." As the Commission has observed, "a station * * * must necessarily change to meet changing community conditions." Columbia Amusement Co., 12 Pike & Fischer, R.R. 509, 567. Also, "considerable flexibility and discretion [in the area of programming] is not only permitted but called for in the public interest." KORD, Inc., 21 Pike & Fischer, R.R. 781, 783.

■ Loyola promised 17.3% live programming in 1961 and it achieved 16.14%. Clearly there was no error in the Commission's determination that there was not substantial deviation warranting denial of renewal. The decision of the Commission must therefore be

Affirmed.