416 F.2d 1120
 LOCAL UNION NO. 519, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPE FITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
H. L. Robertson and Associates, Inc., Intervenor.
 No. 21985.
 United States Court of Appeals District of Columbia Circuit.
 Argued February 14, 1969.
 Decided April 11, 1969.
 Petition for Rehearing Denied May 28, 1969.
 
 Mr. Donald J. Capuano, Washington, D. C., with whom Messrs. Martin F. O'Donoghue, Washington, D. C., and Joseph H. Kaplan, Miami, Fla., were on the brief, for petitioner.
 Mr. Elliott Moore, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, were on the brief, for respondent.
 Mr. Joseph A. Perkins, Miami, Fla., for intervenor.
 Before PRETTYMAN, Senior Circuit Judge, and WRIGHT and TAMM, Circuit Judges.
 TAMM, Circuit Judge:
 
 
 1
 We affirm the order of the National Labor Relations Board, as modified.
 
 
 2
 In 1966 the petitioner, Plumbers Local Union No. 519, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO (hereinafter referred to as "petitioner" or "Union"), was involved in a labor dispute with H. L. Robertson and Associates Plumbing, Inc. (hereinafter "Robertson"), a non union contractor. In October of that year, Robertson, under contract with Babcock Builders, Inc. (hereinafter "Babcock"), began to install plumbing in the so-called D. P. D. Corporation building in Coral Gables, Florida. Sometime in mid-October the Union instructed one Henry LeBold to go to the job site in question and there await the arrival of Robertson employees. LeBold was further instructed that upon commencement of work by these same employees he was to set up a picket line publishing the Union's grievances with Robertson. From October 19 to October 28 LeBold sat patiently in his automobile awaiting these tradesmen and, upon ascertaining their presence on the job site on October 28, he hoisted his sign[1] and began to picket. The picketing continued throughout the week (including Saturday but excluding Sunday) and into the following week. Simultaneous with and for some time preceding LeBold's activity, the bargaining representative for Babcock's laborers had been picketing the same job site. However, on November 2, 1966, that union reached an accord with Babcock and work in those related trades proceeded. That same day representatives from Babcock (its president) and Robertson (its president) and a local attorney met with the purpose of resolving the problem of petitioner's picket line. There it was "determined that the thing to do was to ask (Robertson) not work (sic) during working hours. * * * It seemed like * * * a good logical thing to do, so (they) proceeded with it. * * * as a procedure of trying to keep (Robertson) employed and (its) contract operating but not shutting down (Babcock's) job." (J.A. 61.) It was further decided at this meeting that Robertson was to work only after 4:30 in the afternoon on weekdays and during the daytime on weekends. It was also resolved that in the event of continued picketing, Babcock was to discharge Robertson and employ a union contractor.
 
 
 3
 On the afternoon of November 2, Babcock called a Mr. Kaplan (Union's attorney) and related to him the fact that Robertson's employees would not, thereafter, be on the job site during the hours of 8:00 A.M. to 4:30 P.M. on weekdays and therefore requested Kaplan to discontinue picketing during those hours. In that conversation Kaplan ascertained that Robertson would work evenings and on weekends and, discovering this, notified Babcock that this conduct amounted to sporadic and intermittent working conditions and the Union would remain firm in its intention to picket during the regular work hours.
 
 
 4
 At 4:12 P.M. Robertson sent a telegram to the Union's business manager, Mr. Long, notifying him of the planned absence of the plumbers during the regular daytime hours (J.A. 106). The following morning, at 11:06 A.M., the Union's representative replied by telegram disclaiming any bad faith and reasserting its intention to continue picketing during "normal" work hours because the picketing was "informational only." (J.A. 106.)
 
 
 5
 Earlier that same morning the Union had resumed picketing the job site despite the absence of Robertson employees and in the face of a statement by Babcock to LeBold "that there were no plumbers on the job." (J.A. 68.) Babcock, upon the refusal of the Union representative to cease his picketing, attempted to contact Mr. Kaplan and being unsuccessful in that regard talked again to Mr. Long. In that conversation Babcock asked the question, "What would happen on that job if another plumbing contractor got the job?" In reply Long noted: "We would not picket H. L. Robertson." (J.A. 100.) Shortly thereafter Babcock terminated the contract with Robertson and then the Union excused LeBold because, in the words of a Union representative, "it's all settled." (J.A. 80.)
 
 
 6
 Robertson filed an unfair labor practice charge with the Regional Director of the Twelfth Region of the Board. The Regional Director refused, however, to issue a complaint. This determination was subsequently reversed by the Board's Office of Appeals and on February 9, 1967, a complaint was issued against the Union charging violation of Sections 8 (b) (4) (i) and (ii)(B) of the National Labor Relations Act, 29 U.S.C. §§ 158(b) (4)(i) and (ii)(B) (1964).[2] A full hearing was had before the trial examiner who made findings of fact, conclusions of law and a recommended order suggesting that the Union cease and desist its unfair labor practices and take certain affirmative steps to implement the order. These findings and conclusions were upheld by the Board and on May 10, 1968, that body adopted the trial examiner's order.[3] The Union filed a petition to review in this court and the Board filed a cross-petition for enforcement of its order. We enforce the order.
 
 
 7
 In order to uphold the Board's ruling in this case, this court must look thereto for a review of the conduct complained of in light of the controlling statute (appendix) and prior case law interpreting its meaning.[4] We must then analyze its decision and inquire whether the result finds substantial evidence in the record for support. If it does — our task is at an end for the scope of our review in these cases is compressed, limited to discovering if there is a rational basis for the decision and full compliance with the law. Where these exist, this court will not and cannot substitute its judgment for the agency's. See Administrative Procedure Act § 10(e), 5 U.S.C. § 706(2)(E) (Supp. III, 1965-67); Amalgamated Clothing Workers of America v. NLRB, 125 U.S.App.D.C. 275, 371 F.2d 740 (1966); International Union UAW v. NLRB, 129 U.S.App.D.C. 196, 392 F.2d 801 (1967); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967); American Federation of Musicians v. FCC, 123 U.S.App.D.C. 74, 356 F.2d 827 (1966). We find such support in the present record.
 
 
 8
 The Board was confronted here with making a determination as to whether the petitioner's activity in picketing the job site at a time when no employees of the primary employer were engaged in their "normal business" amounted to lawful "primary picketing" or whether it more realistically involved secondary objectives thereby becoming unlawful. The difficulty in making such definitional distinctions has been the subject of numerous legal articles[5] but it has been generally held that primary picketing is that activity designed "at applying economic pressure by halting the day-to-day operations of the struck employer," United Steelworkers of America AFL-CIO v. NLRB, 376 U.S. 492, 499, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964), and thereby attaining an enhanced bargaining position with that employer. On the other hand the "gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands." IBEW Local 501 v. NLRB, 181 F.2d 34, 37 (2d Cir. 1950). In other words "it is unlawful for a labor organization to induce employees of a neutral employer to strike or for a labor organization to pressure a neutral employer where the object of the union is to force such employer to cease doing business with another employer * * *." Sheet Metal Workers International Association, Local 223 AFL-CIO v. Atlas Sheet Metal Company of Jacksonville, 384 F.2d 101, 105 (5th Cir. 1967). It is a comparatively easy task, under these cases, to determine that conduct amounts to secondary boycotting where, for example, strikers leave the premises of the struck employer to journey across the city to take up their signs at the premises of their employer's principal customer. However, where the employer and the customer occupy the same job situs, as in most construction contract cases, an added difficulty arises. Is the picketing of the job situs primary or secondary? With the hope of resolving this question, the Board, in 1950, sought to implement the caveat-like language of the statute[6] by outlining certain criteria it would use in determining whether the picketing of the premises of the secondary employer, where both he and the primary employer occupy the same job situs, was primary in nature and therefore lawful. The Board held that
 
 
 9
 the picketing of the premises of the secondary employer is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer. (Citations omitted.)[7]
 
 
 10
 These so-called Moore Dry Dock criteria have been approved by a number of the circuits as well as by the Supreme Court. See Local 761, International Union of Electrical, Radio and Machine Workers v. NLRB (General Electric), 366 U.S. 667, 679, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961), and cases cited therein. The Court in General Electric noted that the "application of the Dry Dock tests to limit the picketing effects to the employees of the employer against whom the dispute is directed carries out the `dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own.'" (Citation omitted.) Id. at 679, 81 S.Ct. at 1292.
 
 
 11
 In the instant case the Union argues that it complied with the Dry Dock rules. It urges that requirement (b) of Dry Dock; namely, that at the time of the picketing the primary employer must be engaged in its normal business at the situs, does not necessarily mean that the presence or absence of employees of the primary is critical to the determination of whether he is engaged in his "normal business" at the situs. If it does, argues the Union, then it is within the power of the employer to force the picketing employees into a violation of Dry Dock by removing his employees from the job. The Union cites this court to our earlier decision in Seafarers International Union, etc. v. NLRB (Salt Dome), 105 U.S. App.D.C. 211, 265 F.2d 585 (1959), as support for its position. However, this court, while answering, in the negative, the question of whether an employer can transform a picket line from a legal one to an illegal one merely by removing his non-supervisory employees, took pains in the following paragraph to note that we did "not intend * * * to make a ruling broader than the case before us." Id. at 590. Since that case is clearly distinguishable, factually,[8] from the case at bar we do not feel constrained to interpret our holding there as being dispositive of the issues here. We do not mechanically apply the Dry Dock standards for we realize that across the board application of any set of standards tends, in the long run, to freeze substance into the mold of form. On the other hand, we do feel that the totality of the circumstance and conduct of the parties must be tested in the light of these standards so that proper determination of the legal consequences may be had.
 
 
 12
 While an "employer may not, by removing all his employees from the situs of the strike, bar the union from publicizing its cause * * *" (citation omitted). General Electric, supra at 680, 81 S.Ct. 1285, by the same token (and in the same case) the employer could, by the use of separate gates for the purposes of ingress to and egress from the job site, lawfully force the union to picket only those "separate gates." We perceive no real distinction between "separate gates" and "separate hours."
 
 
 13
 The question of whether the primary employer is engaged in his "normal business" at the situs is clearly one of factual analysis after a careful review of the "totality of the circumstances."[9] Here the record supports the findings of the trial examiner that Robertson was to cease his "normal business" of plumbing contracting during regular work hours of general contracting. He, thereafter, was to resume his "normal business" at nights and on weekends. These new hours were certainly not conventional, but the fact remains that "normal business" would be conducted during those new hours. These changes in plans were communicated to the Union, but the Union continued to picket even though Robertson was not about his "normal business." This activity was clearly a substantial departure from the standards of Moore Dry Dock.
 
 
 14
 However, the Union argues in the alternative that since a legitimate object of picketing is publication of the Union's dispute, the presence or absence of primary employees on the job is of no consequence, and also, even assuming a violation of Moore Dry Dock standards of "normal business," the Union's activity must be upheld on the ground that the Union had no unlawful objective or intent when it picketed the D. P. D. building construction site. The argument makes the distinction between object and effect by urging that if picketing of the primary has only a collateral effect of pressuring the secondary employer then, since Congress most certainly expressed its desire to permit lawful picketing, such an effect is merely an unfortunate concomitant of lawful picketing for "however severe the impact of primary activity on neutral employers, it [is] not thereby transformed into activity with a secondary objective." National Woodwork Manufacturers Association, supra note 4, at 627, 87 S.Ct. at 1259.
 
 
 15
 We have little problem with the argument that the Union had a legitimate object in publicizing its dispute — a legitimate object of picketing is publication as a means of communicating a grievance, see Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed 836 (1941); NLRB v. Local 3, IBEW, 317 F.2d 193 (2d Cir. 1963); Dunn v. Retail Clerks International Association, 307 F.2d 285 (6th Cir. 1962); Centralia Building and Construction Trades Council v. NLRB, 124 U.S.App. D.C. 212, 363 F.2d 699 (1966); NLRB v. Local 3, IBEW, 339 F.2d 600 (2d Cir. 1964). However, publicizing a dispute cannot, in and of itself, render unfair and unlawful labor practices lawful and fair in the face of Moore Dry Dock and the legion of cases there in accord. In our view where there is a substantial departure from the Dry Dock standards, while not amounting to a per se violation of the statute, does at least give rise to a presumption that the Union is acting without the comfort of statutory protection. Add to this basic presumption the fact that the Union was on actual notice of the planned change in work scheduling, that it subsequently failed, in the face of such notice, to cease picketing the secondary employer's premises, and only stopped picketing upon ascertaining that "all [was] settled," we are left with the realization that we cannot say that the Board's determination was either without substantial evidence in the record or unsupported by the case law. Accordingly we must affirm.
 
 
 16
 One last note with respect to the full application of the Board's order. We notice that the trial examiner's suggested order, which was adopted by the Board with slight modification, called upon the Union to not only cease and desist from forcing Babcock into severing his ties with Robertson but also sought to extend that prohibition with respect to "any other secondary employer." Such an attempted extension of the Board's power is inconsistent with the several holdings of this court in that regard. See, for example, Local 636, United Ass'n of Journeymen & Apprentices of Plumbing and Pipe Fitting Ind., etc. v. NLRB, 108 U.S.App.D.C. 24, 278 F.2d 858 (1960), and cases cited therein. To the extent there inconsistent, the Board's order is modified.
 
 
 17
 So ordered.
 
 
 18
 PRETTYMAN, Senior Circuit Judge, concurs in the result.
 
 APPENDIX
 
 19
 29 U.S.C. § 158. Unfair Labor Practices.
 
 
 20
 (b) It shall be an unfair labor practice for a labor organization or its agents —
 
 
 21
 (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is —
 
 
 22
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing * * *.
 
 
 
 Notes:
 
 
 [1]
 The sign bore the legend —
 This is to advise the public that Plumbers Local Union No. 519, AFL-CIO, has a grievance against H. L. Robertson and Associates, Inc. The facts — they employ plumbers at substandard conditions which lets them take jobs away from us. They lower working standards. This is not intended to cause any employee to strike their employer or refuse to deliver any goods. (J.A. 9)
 
 
 [2]
 For full text of these sections see appendix
 
 
 [3]
 The Board did modify the suggested order in certain minor respects not here pertinentSee however the text, infra, at 1126, with regard to full application of the order.
 
 
 [4]
 For a complete discussion of the impact and purpose of this statute,see National Woodwork M'f'rs Ass'n v. NLRB. 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).
 
 
 [5]
 Lesnick, The Gravamen of the Secondary Boycott, 62 COL.L.REV. 1363 (1962); Lesnick, Job Security and Secondary Boycotts: The Reach of NLRA §§ 8(b)(4) and 8(e), 113 U.PA.L.REV. 1000 (1965)
 
 
 [6]
 Section 158(b)(4)(ii)(B) contains this proviso —Provided that nothing contained in this clause (B) shall be construed to make unlawful where not otherwise unlawful, any primary strike or primary picketing * * *.
 
 
 [7]
 Sailors Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547, 549 (1950)
 
 
 [8]
 InSalt Dome, after legitimate picketing of the primary had begun, he, without notice to the union, removed his non-supervisory workers from the job situs (a ship) and for 11 days thereafter there was no activity on the job. On the evening of that 11th day, the ship was towed from dry dock and secretively outfitted with a new crew (with some old employees). Here the Union was notified of the planned absence and also of the changed work schedule. Everything was open to the view of the Union. Further, in Salt Dome, the employer was attempting to eliminate entirely the union's picketing, thus cutting off altogether the legitimate union object of publicizing its dispute (see text, infra). In the present case the union was still free to picket at the site during the changed work hours.
 
 
 [9]
 See Glazier's Local 558 v. NLRB, 132 U.S.App.D.C. 394, 408 F.2d 197 (1969).