**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 480, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 22146.**

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 26, 1969.

Decided April 16, 1969.

9. Stovall v. Denno, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

10. *Ibid.*

Before BURGER, WRIGHT and ROBIN-SON, Circuit Judges.

**J. SKELLY WRIGHT, Circuit Judge:**

The National Labor Relations Board found that Local 480 of the International Brotherhood of Electrical Workers violated the secondary boycott section of the National Labor Relations Act, Section 8 (b) (4) (i) and (ii) (B).[1] For the reasons stated herein, we deny the petition for review and order enforcement of the Board's order.[2]

I

Gulf Coast Building and Supply Company was the general contractor for construction of a shopping center in Natchez, Mississippi. It used Gulf Electric Construction Company (no affiliation with Gulf Coast) as its electrical subcontractor. Gulf Electric was not a union employer. Construction of the shopping center began in January 1967. On February 28 the union started picketing the single entrance gate to the construction site. The union claimed that its sole dispute was with Gulf Electric, the dispute being that Gulf Electric did not pay area wage scales and did not follow area working standards which were adhered to by union electrical employers, thus undermining those scales and standards. The sole purpose of the picketing, according to the union, was to pressure Gulf Elec-

Mr. Dixon L. Pyles, Jackson, Miss., with whom Mr. Laurence J. Cohen, Washington, D. C., was on the brief, for petitioner.

Mr. David C. Nevins, Atty., National Labor Relations Board, of the bar of the Supreme Court of Minnesota, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Gary Green, Atty., National Labor Relations Board, were on the brief, for respondent. Mr. John I. Taylor, Jr., Atty., National Labor Relations Board, also entered an appearance for respondent.

1. 29 U.S.C. § 158(b) (4) (i) and (ii) (B) (1964):
  "(b) It shall be an unfair labor practice for a labor organization or its agents—
  *  *  *  *  *
  "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
  *  *  *  *  *

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]"

2. The decision and order of the Board are reported at 172 N.L.R.B. No. 64 (June 26, 1968).

tric into meeting the area scales and standards.

Consistent with the union's avowed purpose, the pickets carried signs which read:

NO DISPUTE WITH
ANY OTHER EMPLOYER
I.B.E.W. LOCAL 480
PROTESTS
SUB STANDARD
WAGES AND ·
CONDITIONS
OF
GULF ELECTRIC CONSTR. CO., INC.
ELECTRICAL CONTR.
NO DISPUTE WITH
ANY OTHER EMPLOYER

The pickets were instructed to tell any persons who asked whether to cross the picket line that the pickets could not tell them what to do—that they should just read the sign.

The picketing lasted, with one short break, until June 23, 1967, at which time it was voluntarily stopped. The pickets patrolled at the sole gate to the construction site until March 1967 when Gulf Coast built a second gate for use solely by employees of Gulf Electric; until this second gate was demolished in June, the pickets restricted their picketing to this special gate. During the course of the picketing some employees of Gulf Coast and of other subcontractors working at the site, as well as some persons delivering supplies to the site, refused to cross the picket line.

In July 1967 Gulf Coast filed unfair labor practice charges against the union. At the hearing before the Board trial examiner, the union's position was that its dispute was solely with the primary party, Gulf Electric, and that its picketing followed the guidelines for picketing one subcontractor at a common construction site as set out in the Board's decision in *Moore Drydock*.[3] However, the trial examiner found, and the Board affirmed, that the union had an unlawful secondary object of its picketing: to force Gulf Coast to sever its contract with Gulf Electric and hire a union electrical subcontractor instead.

In reaching this conclusion, the trial examiner (and the Board) relied upon substantial evidence, including certain actions of the union in refusing to cooperate with Gulf Electric and Gulf Coast when they attempted to satisfy the union's stated picketing demands, which, the Board concluded, showed that the union's real aim was not forcing Gulf Electric to meet area standards but to force Gulf Coast to replace Gulf Electric.

We affirm the Board's order on the basis of this evidence. We reject the union's contention, discussed *infra* in Part IV, that the Board relied upon impermissible evidence in finding a violation of the Act.

II

It is conceded that if the union's sole object was to get Gulf Electric to pay area standards, and the union's actions were not intended to pressure neutral employers to cease doing business with Gulf Electric, and the means used by the union were reasonably limited to accomplish its primary object, then the union's actions did not constitute a secondary boycott. On the other hand, it is also conceded that if the union did have the purpose of forcing or coercing Gulf Coast to sever its ties with Gulf Electric, and the union's picketing was designed to accomplish that purpose, then the union's actions amounted to a secondary boycott, prohibited by Section 8(b) (4) (i) and (ii) (B) of the Act.

In *Moore Drydock* the Board

"set out four standards for picketing in [common situs] situations which would be presumptive of valid primary activity: (1) that the picketing be limited to times when the situs of dispute was located on the secondary premises, (2) that the primary employer be engaged in his normal business at the situs, (3) that the picketing take place reasonably close to the situs, and

---

3. Sailors' Union of the Pacific [Moore Drydock], 92 N.L.R.B. 547 (1950).

(4) that the picketing clearly disclose that the dispute was only with the primary employer. These tests were widely accepted by reviewing federal courts. * * * "

Local 761, Int. U. of Electrical etc. Workers v. N. L. R. B. [General Electric], 366 U.S. 667, 677, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). Here Gulf Electric, the primary employer, was doing its normal business on the premises of the secondary employer, Gulf Coast. The picketing was limited to these premises; it took place at the sole gate to the situs, later shifting to the special gate built for Gulf Electric. The picket signs stated clearly and unequivocally that the dispute was only with Gulf Electric. Thus the *Moore Drydock* guidelines were followed.

The Board, however, in determining whether the picketing was secondary, went beyond the union's avowed primary purpose and its compliance with *Moore Drydock*. The Board relied on the following evidence: the union did not, before, or for almost a month after, the picketing began, make any attempt to verify, by meeting with Gulf Electric, that its wages and working conditions were substandard. Further, at a meeting on March 23 attended by a representative of Gulf Coast, Gulf Electric's general superintendent, Fleming, and the union's business manager, Erickson, Fleming asked for a copy of the union's area contract so that Gulf Electric could determine how it was failing to meet area standards; Erickson never provided Fleming with this information. At the same meeting the representative of Gulf Coast offered to pay the difference between Gulf Electric's standards and the area standards; Erickson said he could not make such a commitment at that time, but would have to check with Mr. Pyles, the attorney for the union. Neither Erickson nor Pyles ever responded to Gulf Coast regarding this offer.[4]

Finally, the picket line was suspended during one day, March 22. The trial examiner found that picketing was stopped by Erickson when he believed, based on conversations with Gulf Coast, that Gulf Coast was replacing Gulf Electric with another electrical subcontractor, a union employer which had a collective bargaining agreement with the union. The picketing resumed the next day when Gulf Coast· failed to carry through with this plan.

■ The Board concluded that the union's equivocal responses to offers aimed at meeting the union's demand for area standards, plus the union's clear and quick response to the suggestion that Gulf Electric be replaced by a union employer, indicated that the union's picketing was aimed at Gulf Coast, with the object of forcing Gulf Coast to replace Gulf Electric.[5] The Board took the position,

4. The trial examiner found that Pyles was an agent of the union in his actions during a phone call from Gulf Coast in which he claimed that he was unaware of this offer. On brief here, the union argues strenuously that Pyles was just the attorney for the union, not the union's agent. However, we need not decide this issue. As seen in text, the relevant actions here were the union's failures to respond to the offers of Gulf Coast and Gulf Electric. Whatever role Pyles may have played in this, it is clear that Erickson, the union's chief agent, never responded to the offers.

5. It may be that the sequence of the offers by Gulf Coast and Gulf Electric to "meet" the union's ostensible demands and then to hold out to the union the promise of replacing Gulf Electric with a union contractor were simply traps, aimed at forcing the union into a position where it looked as if it had an unlawful secondary object. Bargaining between employers and unions in labor disputes is often not chivalrous, and both sides need a fair degree of sophistication. Perhaps so as not to betray its naiveté, the union has not claimed the offers here were in fact bait. We note that trial examiners are often attuned to such possibilities. The trial examiner's opinion in Plumbers Local Union No. 519, etc. v. N.L.R.B., 135 U.S.App. D.C. ——, 416 F.2d 1120 (1969), pointed out that the conduct of the employers in that case was a trap: "The thought, presumably, was that if the Union bit at the bait this would impale it as a picketer for an object of forcing Babcock [the

and argues here, that when such an object can be shown in a common situs picketing situation, a violation of the Act is made out despite the union's formal compliance with the *Moore Drydock* guidelines. We agree.

### III

It has been well recognized that the prohibitions of Section 8(b) (4) (i) and (ii) (B) cannot be interpreted literally; what is rather called for is fine line-drawing between primary and secondary activity. *General Electric, supra.* Further, "[i]mportant as is the distinction between legitimate 'primary activity' and banned 'secondary activity,' it does not present a glaringly bright line." *Id.,* 366 U.S. at 673, 81 S.Ct. at 1289. The Supreme Court, and this court, have made clear that the key factor is the *objective* of the union activity, whether it is aimed at the primary employer or whether it is also aimed at pressuring the secondary employer. N. L. R. B. v. International Rice Milling Co., 341 U.S. 665, 672, 71 S.Ct. 961, 95 L.Ed. 1284 (1951); Seafarers' International Union v. N. L. R. B. [Salt Dome], 105 U.S.App. D.C. 211, 216, 265 F.2d 585, 590 (1959). It is thus the difficult task of the Board to examine activity which has both primary and secondary effects and to determine whether the secondary effects were truly an objective of the activity.

Given the delicacy of this task, it is obvious that the Board needs both general guidelines and a flexible approach. The *Moore Drydock* standards were set up as such guidelines, but as long ago as 1955 we noted that there could be no "rigid rule" for determining what is primary picketing and what is secondary. Sales Drivers, Helpers & Building Construction Drivers, Local Union 859, etc. v. N. L. R. B., 97 U.S.App.D.C. 173, 176, 229 F.2d 514, 517 (1955), cert. denied, 351 U.S. 972, 76 S.Ct. 1025, 100 L.Ed. 1490 (1956). Thus in a sequel to *Sales Drivers* we held that although the union picketing appeared to square with the *Moore Drydock* requirements, the Board was correct in finding from external evidence that the picketing had the unlawful secondary object of coercing neutral employers to cease doing business with the primary employer. Truck Drivers & Helpers Local Union 728, etc. v. N. L. R. B., 101 U.S.App.D.C. 420, 249 F.2d 512 (1957), cert. denied, 355 U.S. 958, 78 S.Ct. 543, 2 L.Ed.2d 533 (1958).

In other words, compliance with the *Moore Drydock* standards is "presumptive" of valid primary picketing, *General Electric, supra,* 366 U.S. at 677, 81 S.Ct. 1285, but the Board is not thereby relieved of carrying out its duty under the Act: determination of whether the object of the picketing is truly primary or not.[6] The Ninth Circuit put it clearly in the recent case of N. L. R. B. v. Northern California District Council of Hod Carriers, 389 F.2d 721, 725 (1968):

" * * * *Moore Drydock* does not establish a formula whereby picketing with a secondary object can be done lawfully. Rather it simply establishes a[n] evidentiary aid for the Board to determine the object of picketing where the other evidence is equivocal. The Board is not bound by the inference of lawfulness from compliance

secondary employer] to terminate Robertson [the primary employer]." The examiner thus discounted the union's agreement there to stop picketing if a union employer was hired to replace the non-union primary employer, pointing out that the union could hardly have responded otherwise since the replacing of the primary employer would have left the union nothing to picket about (the dispute was to force the primary employer to follow area standards). It is, of course, for the examiner and the Board to make the first inferences about when offers by employers in disputes of this sort are nothing more than, in the words of the examiner in *Plumbers Local Union,* "hanky-panky."

6. The reverse is true as well. Where a union's picketing departs from the standards of *Moore Drydock,* that may be presumptive of a violation of § 8(b) (4) (i) and (ii) (B), but it is open to the union (and the Board) to demonstrate that the picketing was not secondary. Plumbers Local Union No. 519, etc. v. N.L.R.B., *supra* Note 5.

with the *Moore Drydock* standards. * * * "

This is the approach the Board applied to the case here. The external evidence credited by the examiner satisfied the Board that the *Moore Drydock* presumption of legality had been overcome.

## IV

The union contends that the examiner and the Board relied on evidence of the secondary *effect* of picketing to conclude that the picketing had a secondary *object*. The union argues that this is an impermissible bootstrap operation and accordingly the Board's order should be reversed or the case remanded. We agree that it would be impermissible for the Board to conclude from the secondary *effect* of picketing that it had a secondary *object*. The two must be kept separate. Otherwise all common situs picketing would be effectively outlawed, since union employees of neutral employers traditionally respect picket lines.[7] A secondary effect is but one evidentiary factor which may shed light on the object of the actors.

The proviso in Section 8(b)(4)(i) and (ii)(B), *"Provided,* That nothing contained in this clause (B) shall be construed to make unlawful * * * primary picketing * * *,"* makes clear that this was not the Act's intention.

We dealt with this problem at length in *Salt Dome, supra:*

" * * * It is clear that, when a union pickets an employer with whom it has a dispute, it hopes, even if it does not intend, that all persons will honor the picket line, and that hope encompasses the employees of neutral employers who may in the course of their employment (deliverymen and the like) have to enter the premises. Thus some of the business relations between the two employers would automatically cease. The union knows this will be the result if, as it hopes, its picket line at the premises of the primary employer is honored. * * * "

105 U.S.App.D.C. 217, 265 F.2d at 591. We noted that such knowledge and hope on the part of the union is not a sufficient basis on which to find a violation of the Act. Rather, the Board must resort to other means to determine whether the union had a secondary object. One way would be to see whether there was substantial variance with the *Moore Drydock* standards; another, as described in Part II, *supra,* is to determine from external actions or statements what the object of the union is. Although it may sometimes be difficult, the Board must confine itself to these means.[8]

---

7. In this case, as in *Plumbers Local Union No. 519, supra* Note 5, the situation presented involves common situs picketing. As the Supreme Court has recently observed, the considerations are different when the picketing is at the situs of the primary employer:

"* * * [P]rotected primary picketing 'has characteristically been aimed at all those approaching the situs whose mission is selling, delivering, or otherwise contributing to the operations which the strike is endeavoring to halt,' * . * * including other employers and their employees. * * * "

Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 388, 89 S.Ct. 1109, 1121, 22 L.Ed.2d 344 (1969) (quoting from United Steelworkers of America, AFL-CIO v. N.L.R.B., 376 U.S. 492, 499, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964)). Further, even in some common situs situations picketing

can be explicitly aimed at secondary employees:

"* * * It is difficult to formulate many generalizations governing common situs picketing, but it is clear that secondary employers are not necessarily protected against picketing aimed directly at their employees. In Electrical Workers v. NLRB [366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 59 (1961)], for example, we noted that striking employees could picket at a gate on the struck employer's premises which was reserved exclusively for employees of the secondary employer, to induce those employees to refuse to perform work for their employer which was connected with the struck employer's normal business operations. * * * "

*Id.* at 389.

8. In Local 761, Int. U. of Electrical etc. Workers v. N.L.R.B., 366 U.S. 667, 673,

It is, of course, somewhat naive to expect anyone to delineate with precision the philosophical difference between a man's hope and his desire, or the psychological difference between a man's informed wish and his intent.[9] Pushed to the extreme, the whole notion of distinguishing between primary and secondary activity runs up against the premise of the law that a man intends the known and probable consequences of his actions. If this principle were applied in determining Section 8(b)(4)(i) and (ii)(B) violations, the Act's attempt to distinguish between primary and secondary activity would abort.

Fortunately for the courts, our task is simply to let the Board first divine these distinctions, and to give the Board great weight in inferring, or not inferring, motive and intent from actions. It is not simply cowardice which impels the courts to take this distant role. Given the tenuous philosophical underpinnings of this aspect of the law, it is apparent that the judgment of what is primary and what is secondary is a pragmatic one, based on an overall impression of the parties' actions and an understanding of their relevant strengths and interests. And this type of pragmatic judgment is best made by the agency which views the battle at first hand.

In this case we disagree with the union that the Board or the examiner simply relied on the evidence of secondary effect and concluded from it that the union had an impermissible object. Rather, although its opinion might have been clearer on this point, we think that this evidence was only used to note that the union's picketing had the predictable secondary consequence, *i.e.*, that neutral employees did respect it. The examiner and the Board did not stop there; they went on, using the external evidence described above, to show that the union's object was, in fact, secondary. The picketing, which had both a secondary object and a secondary effect, was then held to violate the Act.

Petition for review denied and cross-petition for enforcement granted.

81 S.Ct. 1285 (1961), the Supreme Court quoted from this court's opinion in *Salt Dome* (Seafarers' Int. U. v. N.L.R.B., 105 U.S.App.D.C. 211, 265 F.2d 585 (1959)). The Court approved our language regarding the difference between knowledge and hope on the one hand and object on the other. The Court also quoted from N.L.R.B. v. Local 294, Int. Brotherhood of Teamsters, 2 Cir., 284 F.2d 887, 890 (1960):

" 'Almost all picketing, even at the situs of the primary employer and surely at that of the secondary, hopes to achieve the forbidden objective, whatever other motives there may be and however small the chances of success.' "

366 U.S. at 673, 81 S.Ct. at 1289. The Supreme Court went on to say:

"But picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck [primary] employer. * * *

"However difficult the drawing of lines more nice than obvious, the statute compels the task. * * *"

*Id.* at 673–674, 81 S.Ct. at 1290.

9. "No cosmic principles announce the existence of secondary conduct, condemn it as an evil, or delimit its boundaries. These tasks were first undertaken by judges, intermixing metaphysics with their notions of social and economic policy. And the common law of labor relations has created no concept more elusive than that of 'secondary' conduct; it has drawn no lines more arbitrary, tenuous, and shifting than those separating 'primary' from 'secondary' activities. * * *"

*Jacksonville Terminal Co., supra* Note 7, 394 U.S. at 386–387, 89 S.Ct. at 1120.