LOCAL UNION NO. 501, INTERNATION-
AL BROTHERHOOD OF ELECTRI-
CAL WORKERS, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL UNION NO. 501, INTERNATION-
AL BROTHERHOOD OF ELECTRI-
CAL WORKERS, AFL–CIO, Respon-
dent.

Nos. 84–1340, 84–1464.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 17, 1985.

Decided March 15, 1985.

Petition for Enforcement of an Order of the National Labor Relations Board.

Petition for Review of an Order of the National Labor Relations Board.

Ralph P. Katz, New York City, for petitioner in No. 84–1340 and cross-respondent in No. 84–1464.

Scott Meza, Chapel Hill, N.C., Atty., National Labor Relations Board, of the Bar of the Supreme Court of North Carolina pro hac vice by special leave of the Court, with whom Elliott Moore, Deputy Associate General Counsel, National Labor Relations Board, Washington, D.C., was on the brief, for respondent in No. 84–1340 and cross-petitioner in No. 84–1464.

Before WRIGHT, WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Local 501, International Brotherhood of Electrical Workers, AFL–CIO ("Local 501" or "the union") seeks review of a decision of the National Labor Relations Board ("NLRB" or "the Board") finding that the union violated the secondary boycott provisions of the National Labor Relations (Taft-Hartley) Act, 29 U.S.C. § 158(b)(4)(i), (ii)(B). The Board, which cross-petitions for the enforcement of its order, concluded that the union engaged in unlawful secondary activity when it picketed the gate reserved for so-called neutral employees at a multi-employer construction site. In many circumstances, neutral gate picketing raises a presumption that the union impermissibly seeks to involve neutral employees and employers in disputes with other employers. Because we believe that the Board improperly applied its neutral gate presumption to the circumstances of this case, however, we grant the union's petition, set aside the

Board's ruling and remand for further proceedings consistent with this opinion.

## I.

This case concerns the legality of labor picketing conducted at a multi-employer construction site in New Canaan, Connecticut. In June of 1982, Frank Mercede & Sons, Inc. ("Mercede"), a general contractor, was engaged in the construction of a building on the campus of St. Luke's School ("St. Luke's") on North Wilton Road in New Canaan. *See* Brief for Petitioner at Appendix C (stipulations between the general counsel and the union) [hereinafter cited as "Stip. ¶"]. Mercede subcontracted parts of the construction work to various subcontractors including non-union C.W. Pond Electric Service, Inc. ("Pond") and two union firms, Berlin Steel Construction Co. ("Berlin") and Buckingham Routh Co. ("Routh"). Local 501 represents area electrical workers and, at all times relevant to this case, was engaged in a dispute with Pond over its alleged failure to pay area standard wages to its employees.

The St. Luke's campus has only two entrances. *See* Stip. ¶ 8. On June 2, 1982, Mercede clearly posted each of these entrances with "reserved gate" signs in anticipation that Local 501 would picket Pond. The main entrance to the campus, Entrance No. 1, was reserved for neutrals: all employees, suppliers, visitors and members of the public other than Pond employees and suppliers. Entrance No. 2, in turn, was exclusively reserved for the employees and suppliers of the primary employer, Pond.[1] Entrance No. 1 is located on North Wilton Road; public traffic on North Wilton is relatively heavy, averaging more than 300 vehicles each work day. *See id.* ¶ 9. It is undisputed that Entrance No. 1 is the main public gateway to St. Luke's. Entrance No. 2, by contrast, is located on a cul-de-sac

---

**1.** In particular, the sign posted at Entrance No. 1 stated: "Entrance # 1—This Entrance is Not To Be Used by C.W. Pond Electric Service Inc., [Its] Employees & Suppliers Who Must Use Entrance # 2." The sign posted at Entrance No. 2 stated: "Entrance # 2—This Entrance is Re-

served for C.W. Pond Electric Service Inc., [Its] Employees & Suppliers—All Other Persons Must Use Entrance # 1." *See* Local 501, International Bhd. of Elec. Workers (C.W. Pond Elec. Serv. Inc.), No. 39–U–31, slip op. at 4 (Sept. 24, 1982) [hereinafter cited as *ALJ Opinion*].

at the end of Soundview Lane, a public road that intersects Laurel Road approximately one mile from the main entrance located at the intersection of Laurel and North Wilton. *See id.* ¶¶ 10–11. Entrance No. 2 is also located near the home of the St. Luke's headmaster. *See id.* ¶ 12. Unlike Entrance No. 1, however, this back gate is not in any way designated as an official entrance to the campus. During the period relevant to this dispute, moreover, virtually no public vehicular traffic passed by Entrance No. 2. *See id.* ¶ 10. In effect, then, Entrance No. 2 is located on a dead end alley behind and tucked around the corner from the main, public entrance to St. Luke's.

From June 3 through June 8, the union stationed pickets at Entrance No. 2, the reserved primary gate, in protest of Pond's alleged failure to pay area standard wages. *See id.* ¶ 3. The picket signs stated:

NOTICE TO THE PUBLIC

THE ELECTRICIANS WORKING FOR C.W. POND, CO

Do Not Receive Wages And Working Conditions As Good as Those Established in Contracts of Local Union No. 501 International Brotherhood of Electrical Workers

This Sign is Not Directed to Any other Employer or Employee on This Job

AFL–CIO

*See ALJ Opinion* at 5. On June 9, however, the union concluded that it would not be able to reach the public at Entrance No. 2 and began picketing at Entrance No. 1, the reserved neutral gate. The union thereafter picketed continuously at Entrance No. 1 and intermittently at Entrance No. 2. *See id.* On several occasions between June 9 and June 16, employees of Berlin and Routh engaged in work stoppages and refused to enter the St. Luke's site—apparently as a result of Local 501's pickets. *See id.* at 5–6. After Berlin's employees consulted with their union representatives, they agreed to resume work for

Berlin provided that no Pond employees were present at the jobsite while Berlin's employees were working. *See* Stip. ¶ 2. At no time during the picketing did the union's agents harass, interfere with or even speak with any employees of Berlin or Routh. *See id.* Shortly after the work stoppages, however, the Board's general counsel issued an unfair labor practice complaint against the union.

The Board, agreeing with its Administrative Law Judge (ALJ), found that the union had violated sections 8(b)(4)(i) and (ii)(B) of the Act by failing to restrict its pickets to the entrance expressly reserved for Pond employees and suppliers, and instead extending the picketing to the neutral gate. *See Local 501, Int'l Bhd. of Elec. Workers (C.W. Pond Elec. Serv. Inc.),* 269 N.L.R.B. No. 52 (March 20, 1984) [hereinafter cited as *Board Opinion*]. By picketing the reserved neutral gate, the Board concluded, Local 501 raised a presumption that it unlawfully sought to enmesh non-Pond or neutral employees in its area standards dispute with Pond. *See id.* at 1–2. The Board also held that the Union was not relieved of its obligation to confine its picketing to the reserved primary gate on any theory that Entrance No. 2 was improperly or unreasonably established. *See id.* at 2–3; *ALJ Opinion* at 8–10. The Board ordered the union to cease and desist from the secondary boycott violation and to post an appropriate notice of compliance. *See ALJ Opinion* at 12–13; *Board Opinion* at 3.

Local 501 now argues that, under the particular circumstances of this case, the Board's presumption that neutral gate picketing establishes a violation of section 8(b)(4) does not constitute a reasonable accommodation of the competing policies embodied in the secondary boycott provisions of the Act. We agree that the NLRB cannot infer a violation of the secondary boycott provisions from the bare fact that the union failed to confine its area standards picketing to a reserved primary gate where that gate is effectively hidden from public view. Because, however, the record does not indicate whether the union could have conveyed its grievance to the public at

any reasonable location other than the neutral gate, we remand this case to the Board for a fuller inquiry into whether Local 501's overall conduct revealed an unlawful intent to enmesh neutrals in its dispute with Pond.

## II.

■ Section 8(b)(4) of the Act provides, in relevant part, that:

It shall be an unfair labor practice for a labor organization or its agents—...

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case *an object* thereof is—... (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person ... *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

29 U.S.C. § 158(b)(4)(i), (ii)(B) (emphasis added). Despite its sweeping terms, section 8(b)(4) does not ban all union activity that ultimately interferes with employers not directly involved in the union's primary labor dispute. Instead, the relevant part of that provision makes it unlawful for a union to pressure neutral employees or employers where "an object thereof" is to cause a person or enterprise to cease doing business with the primary employer with whom the union has a dispute. *See Local 1976, United Bhd. of Carpenters v. NLRB (Sand Door & Plywood Co.),* 357 U.S. 93, 98, 78 S.Ct. 1011, 1015, 2 L.Ed.2d 1186 (1957). Section 8(b)(4) is thus designed to

balance the dual congressional objectives of "preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Bldg. & Constr. Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).

■ Although the Act's distinction between "primary" and "secondary" activity is often "more nice than obvious," *Local 761, Elec. Workers v. NLRB (General Elec.),* 366 U.S. 667, 674, 81 S.Ct. 1285, 1290, 6 L.Ed.2d 592 (1961), it is by now well-settled that union conduct violates section 8(b)(4) if *any* object of that activity is to exert improper influence on secondary or neutral parties. *See Denver Building,* 341 U.S. at 689, 71 S.Ct. at 951; *cf. Local 519, United Ass'n of Journeymen v. NLRB,* 416 F.2d 1120, 1124–25 (D.C.Cir. 1969). The ultimate inquiry focuses on the intent of the union, not the effects of its actions. *See NLRB v. International Rice Milling Co.,* 341 U.S. 665, 672, 71 S.Ct. 961, 964, 95 L.Ed. 1277 (1951); *NLRB v. National Ass'n of Broadcast Employees, Local 31,* 631 F.2d 944, 950 (D.C.Cir.1980). As the Supreme Court has recognized:

"Almost all picketing ... hopes to achieve the forbidden objective, whatever other motives there may be and however small the chances of success." But picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer.... Accordingly, the Board and the courts have attempted to devise reasonable criteria drawing heavily upon the means to which the union resorts in promoting its cause.

*General Electric,* 366 U.S. at 673–74, 81 S.Ct. at 1289–90 (quoting *NLRB v. Local 294, Int'l Bhd. of Teamsters,* 284 F.2d 887, 890 (2d Cir.1960)) (citation omitted). The Board must therefore establish that union conduct reveals a specific intent to involve

neutrals in labor disputes not their own in order to establish a secondary boycott violation.

 Where the primary and the neutral employer occupy separate worksites, the line between legitimate primary activity and unlawful secondary conduct is relatively straightforward. In general, picketing the primary employer's premises for the purpose of pressuring that employer is protected primary activity while picketing that extends to the neutral employer's jobsite in order to disrupt the latter's operations is considered prohibited secondary conduct. *See generally DiGiorgio Fruit Corp. v. NLRB*, 191 F.2d 642, 648–49 (D.C.Cir.), *cert. denied*, 342 U.S. 869, 72 S.Ct. 110, 96 L.Ed. 653 (1951). Where the primary and neutral employer occupy the same jobsite, however, the primary/secondary distinction is not so easily drawn, and the Board and the courts have required a more exacting inquiry into the union's intent. *See, e.g., General Electric*, 366 U.S. at 675–81, 81 S.Ct. at 1290–93. As an *evidentiary* tool for determining intent in this "common situs" situation, the Board has required that, to avoid violating section 8(b)(4), a union must show that:

(a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs;* (c) the picketing is limited to places reasonably close to the location of the *situs;* and (d) the picketing discloses clearly that the dispute is with the primary employer.

*Sailors Union of the Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547, 549 (1950) (footnotes omitted). Violation of any of these standards raises a presumption of illegitimate secondary intent. *See, e.g., General*

*Electric*, 366 U.S. at 677, 81 S.Ct. at 1291; *Association of Journeymen*, 416 F.2d at 1125–26; *Retail Fruit & Vegetable Clerks' Union, Local 1017 (Crystal Palace Market)*, 116 N.L.R.B. 856, 858–59 (1956) (on the theory that compliance with these standards "minimizes" interference with neutrals), *enforced*, 249 F.2d 591 (9th Cir. 1957). If a union satisfies these rules, however, its conduct is presumed to be primary and thus protected. *See General Electric*, 366 U.S. at 677, 81 S.Ct. at 1291. The *Moore Dry Dock* standards are not intended to be indiscriminate or per se rules. *See International Bhd. of Elec. Workers, Local 640 (Timber Bldgs., Inc.)*, 176 N.L.R.B. 150, 151 (1969). The Board and the courts must ultimately examine the "totality of circumstances" to determine whether the union's conduct indicates an unlawful secondary intent. *See Broadcast Employees*, 631 F.2d at 951; *International Bhd. of Elec. Workers, Local 480 v. NLRB*, 413 F.2d 1085, 1089 (D.C.Cir.1969).

At issue in this case is the third *Moore Dry Dock* standard—whether Local 501 confined its picketing to a location "reasonably close" to the situs. In applying this standard, courts and the Board have generally approved attempts to insulate the primary dispute by establishing reserved gates for primary and neutral employees respectively. *See General Electric*, 366 U.S. at 680–81, 81 S.Ct. at 1293–94. Once a reserved gate system has been properly established, the Board's analysis of the third *Moore Dry Dock* standard focuses on the proximity of the picketing to the reserved gate rather than to the general work location. *See, e.g., International Bhd. of Elec. Workers, Local 323 (Renel Constr. Inc.)*, 264 N.L.R.B. 623, 624 (1983). With exceptions not relevant here,[2] the Board has generally found a violation of

**2.** The Supreme Court has carved out an exception to the neutral gate presumption when the would-be secondary employer performs work closely related to the operations of the primary employer at the primary employer's place of business. *See General Electric*, 366 U.S. at 679–80, 81 S.Ct. at 1292–93. The related work exception, however, has not been generally applied to common situs disputes involving construction

firms operating on the premises owned by a third party. *See Building & Constr. Trades Council (Markwell & Hartz, Inc.)*, 155 N.L.R.B. 319 (1965), *enforced*, 387 F.2d 79 (5th Cir.1967), *cert. denied*, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968). Local 501 does not argue here that Berlin and Routh performed tasks connected to Pond's normal operations.

the third *Moore Dry Dock* standard—and thus presumed an illegitimate secondary intent—when picketing is conducted at a gate reserved for neutral employees unless the gate is improperly or unreasonably established, not honored, or misused. *See, e.g., Association of Journeymen,* 416 F.2d at 1125; *International Bhd. of Elec. Workers, Local 453 (Southern Sun Elec. Corp.),* 237 N.L.R.B. 829 (1978), *aff'd per curiam,* 620 F.2d 170 (8th Cir.1980). The presumption that neutral gate picketing establishes a secondary boycott violation, of course, ordinarily forces the union to picket only the reserved primary gate. *See, e.g., J.H. Hoff Elec. Co. v. NLRB,* 642 F.2d 1266, 1270 (D.C.Cir.1980), *cert. denied,* 415 U.S. 918, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981); *Association of Journeymen,* 416 F.2d at 1125.

In effect, then, the neutral gate "rule" amounts to an evidentiary device for gauging another evidentiary device (the third *Moore Dry Dock* standard) that structures the Board's inquiry into whether common site picketing was intended to enmesh neutrals. The Board has long recognized, moreover, that this chain of presumptions should not be applied mechanically and that neutral gate picketing might not, under some circumstances, indicate an illegitimate secondary intent.

> While the Board has held that picketing at locations other than at a properly marked gate may indicate non-compliance with *Moore Dry Dock* standards, the mere posting of signs does not limit the situs of the dispute.... The purpose of the separate gate is to permit lawful picketing that will be conducted so "as to minimize its impact on neutral employees insofar as this can be done without substantial impairment of the effectiveness

of the picketing in reaching the primary employees."

*Timber Buildings,* 176 N.L.R.B. at 151 (quoting *Crystal Palace,* 116 N.L.R.B. at 859) (citations omitted); *see also Renel Construction,* 264 N.L.R.B. at 624; *International Bhd. of Elec. Workers, Local 441 (Suburban Dev. Co.),* 158 N.L.R.B. 549, 551–52 (1966).

## III.

█ In this case, Local 501 concedes that it had ample opportunity to reach the employees of Pond at Entrance No. 2. It argues, however, that the location of the reserved primary gate unreasonably impaired the union's otherwise legitimate and protected attempt to convey its area standards message to the public. Otherwise proper area standards picketing is clearly protected conduct under section 7 of the Act, 29 U.S.C. § 157, which protects concerted activity for mutual aid or protection. *See, e.g., Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 206 n. 42, 98 S.Ct. 1745, 1762 n. 42, 56 L.Ed.2d 209 (1978); *Giant Food Markets, Inc. v. NLRB,* 633 F.2d 18, 24–25 (6th Cir.1980); *International Hod Carriers, Local 41 (Calumet Contractors Ass'n),* 133 N.L.R.B. 512 (1961); *cf. Denver Building,* 341 U.S. at 692, 71 S.Ct. at 953 (noting that section 8(b)(4) was intended to preserve "the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes").[3] Both the Board and the courts have also recognized that communicating a grievance to members of the public is an important aspect of area standards picketing. *See, e.g., Giant Foods,* 633 F.2d at 24 ("If area standards picketing is protected under section 7 of the NLRA, ... [the] pickets must be

---

**3.** Although the union suggests that the Board's application of the neutral gate presumption in this case also infringes its first amendment rights, we believe that its position is more properly grounded in the Act itself, in either sections 7 and 13 which respectively protect concerted activity and the right to strike, *see* 29 U.S.C. §§ 157, 163, or under the proviso to section 8(b)(4)(ii)(B) which specifically excludes primary picketing from the proscription on secondary boycotts, *see id.* § 158(b)(4)(ii)(B). The union cannot assert an independent first amendment right to picket the neutral gate in this case if that action *properly* constituted a violation of section 8(b)(4). *See, e.g., International Bhd. of Elec. Workers v. NLRB,* 341 U.S. 694, 705, 71 S.Ct. 954, 960, 95 L.Ed. 1299 (1951) (prohibiting secondary boycotts does not violate the first amendment).

allowed a reasonable means of communicating with the consumers."); *United Bhd. of Carpenters, Local 354 (Sharp & Tatro Dev., Inc.)*, 28 N.L.R.B. No. 58, slip op. at 10 (Dec. 15, 1983) (ALJ Opinion accepted by Board).[4]

Moreover, the Board has itself concluded that the neutral gate presumption should not be applied when the location of the reserved primary gate substantially and unreasonably impairs a union's ability to convey an area standards picketing message to the public. In *Southern Sun*, for example, the Board was presented with two neutral gate problems: the reserved primary gate was located in a back alley out of public view, and the reserved gate system was not completely honored (the president of the primary employer had used the neutral rather than the primary gate). The Board held that the gates were "improperly established" and that the union's neutral gate picketing thus could not presumptively establish a violation of the secondary boycott provisions.

> Restrictions of picketing to the entrances reserved for the primary Employer would unjustly impair the effectiveness of Respondent's lawful picketing to convey its message to Southern Sun personnel, suppliers, visitors, *and the general public*. The diagram and detailed description of the signs and separate entrances, set forth in the Administrative Law Judge's Decision, make absolutely clear that neither the primary nor the neutral area was delineated in such a manner to provide reasonable assurances to Respondent that its message would be carried to *all within the legitimate, direct appeal of its picket sign*. We there-

fore find that the legal s[it]us of the dispute was not restricted by the posted signs and, absent evidence that the picketing did not otherwise fully conform with *Moore Dry Dock* standards, that it was not conducted in a manner from which a proscribed secondary objective is inferable.

*Southern Sun*, 237 N.L.R.B. at 830 (emphasis added) (footnote omitted).

Similarly, in *Sharp & Tatro*, the Board indicated that the neutral gate presumption would become unreasonable if it functioned to deprive the union of an effective public forum. In that case, the ALJ, affirmed by the Board, reasoned that the *Southern Sun* case

> reflects [the Board's] basic determination that—when a concerned labor organization finds itself, consistently with *Moore Dry Dock*'s requirements, presumptively constrained to picket "reasonably" close to some primary employer's reserved gate *effectively hidden from public view, or so remotely located as to substantially impair the effectiveness of the labor organization's otherwise lawful picketing calculated to reach* the primary employer's personnel, suppliers, visitors and *the general public*—no defined circumscription, designed to confine or restrict the area within which permissible common situs picketing may be conducted, would be warranted.

*Sharp & Tatro*, 268 N.L.R.B. No. 58, slip op. at 10 (emphasis added). The Board has thus recognized that it cannot mechanically infer a secondary boycott violation from a union's failure to confine its pickets to a reserved primary gate virtually hidden from public view without at least *consider-*

---

**4.** The Board has described the purposes of area standards picketing as follows:

> Area standards picketing is engaged in by a union to protect the employment standards it has successfully negotiated in a particular geographic area from the unfair competitive advantage that would be enjoyed by an employer whose labor cost package was less than those of employers subjected to the area contract standards. Failure to protect these standards could result in an undermining of wage and benefit gains in such areas. Therefore, in

its attempt to protect the area standards, a union acts [not] only in its own interest, but also in the interest of employees of employers with whom it has negotiated more beneficial employment standards. It is this legitimate nature of the union's actions which we believe makes properly conducted area standards picketing not only lawful, but affirmatively protected under Section 7 of the Act.

*Giant Food Markets, Inc.*, 241 N.L.R.B. 727, 728 (1979) (footnotes omitted), *enforcement denied*, 633 F.2d 18 (6th Cir.1980).

*ing* the effects of the neutral gate presumption on the union's legitimate interest in reaching the public.

In the case before us, however, neither the ALJ nor the Board took seriously the proposition that a union need not confine its pickets to a reserved primary gate if the location of the gate substantially impedes the union from reaching an important part of its intended audience. After finding that St. Luke's had only two entrances, the ALJ concluded simply that:

> The general contractor had every right, under Board law, to establish reserve gates for the employees of Pond at one of the two entrances, and a reserve gate for all other employees ... at another gate. The fact that one gate happens to be located on a street where a reasonable amount of traffic goes by, while the other gate is located at a juncture where there is extremely light traffic, forms *no basis* for the conclusion, the reserve gate was improperly established.

*ALJ Opinion* at 9–10 (emphasis added); *see also id.* at 11 (concluding that the union's evidence did not have "sufficient probative value"). In our view, this conclusion does not constitute a reasonable accommodation of the union's legitimate interest in reaching the public and the policy of insulating neutral employees and employers from disputes not their own. *Southern Sun* and *Sharp & Tatro* strongly indicate that the neutral gate presumption should not be applied indiscriminately to force a union to confine its picketing to a reserved primary gate virtually hidden from public view.

The Board's opinion in this case, however, merely concluded that:

> ... *Southern Sun Electric* does not hold that a primary reserved gate on a public road is established improperly simply because there is little traffic by the general public at the primary reserved gate. In the instant case the primary reserved gate was clearly marked and maintained, and thus the Respondent Union *was able to convey its message directly to* the

primary employer and its employees, visitors, suppliers, and *the general public. Board Opinion* at p. 3 (emphasis added). Thus, neither the ALJ nor the Board undertook any circumstance-specific analysis of whether the neutral gate presumption would, in effect, deprive the union of a public forum in this dispute. Yet Local 501 alleged, and the parties *stipulated,* that the reserved primary gate was virtually hidden from *all public view. See supra* p. 891. Faced with this stipulation, we believe that the Board was required to determine whether the employer's reserved gate system unreasonably operated to impair the union's legitimate interest in reaching the public. *See, e.g., Sharp & Tatro,* 268 N.L.R.B. No. 58, slip op. at 11–18 (conducting such an inquiry); *see generally Hoff,* 642 F.2d at 1269–70 (noting that the reserved gate standards are intended to strike a reasonable balance among the competing interests in the common situs context).

In view of its protected interest in communicating its area standards dispute with Pond to the general public, then, we believe that Local 501's refusal to confine its picketing to a back entrance hidden from virtually all public view does not by itself imply an unlawful intent to enmesh neutrals. Similarly, we conclude that the Board cannot establish, on the record as it now stands, a violation of section 8(b)(4) in this case by relying on the presumption of unlawful secondary intent ordinarily generated by neutral gate picketing. If Entrance No. 1, the main entrance to St. Luke's, constituted the only location at or near the job site at which the union could obtain reasonable public exposure, the neutral gate presumption could not accommodate the union's legitimate interests. This conclusion does not mean, however, that Local 501 was necessarily justified, under the circumstances of this case, in picketing the reserved neutral gate at Entrance No. 1. We hold *only* that the Board cannot here rely on the presumption ordinarily generated by neutral gate picketing without considering whether the reserved gate system unreasonably deprived the union of its oth-

erwise protected right to reach the public. Instead, the Board must determine whether the totality of the union's conduct in this dispute indicates an illegitimate secondary intent. *See, e.g., Broadcast Employees,* 631 F.2d at 951–52 (conducting such an inquiry).

In particular, we believe that Local 501's decision to picket the reserved neutral gate might still indicate an unlawful secondary intent if the union could have gained reasonable access to the public at some location near the job site other than the neutral gate. In *Sharp & Tatro,* for example, the ALJ reasoned that the ordinary neutral gate presumption could not be applied if the location of the reserved primary gate effectively precluded the union from reaching the public. *See supra* pp. 895–96. After a detailed factual inquiry, however, the ALJ concluded that the union nonetheless violated section 8(b)(4) when it picketed the neutral gates because it could have reached the public by picketing a readily apparent location near the job site that was reasonably distant from the neutral gate. Indeed, the union involved in *Sharp & Tatro* had stationed pickets at that alternative public location before it moved to the neutral gate. *See Sharp & Tatro,* 268 N.L. R.B. No. 58, slip op. at 11–14; *cf. Helgesen v. International Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 498,* 548 F.2d 175, 182–83 (7th Cir.1977) (concluding that the union did not act with

a proscribed secondary intent when it picketed an alternative public location reasonably separated from the neutral gate instead of picketing the primary gate); *Hoff,* 642 F.2d at 1276–77 (affirming a Board finding that picketing not limited to the reserved gate was nonetheless "reasonably close" to the situs and thus did not indicate a secondary intent).

 In our view, the *Sharp & Tatro* approach reasonably accommodates both the union's legitimate interest in reaching the public and the policy of insulating neutral employers and employees from secondary activity.[5] When an employer establishes a primary reserved gate in a manner that unreasonably denies the union an opportunity to convey its message to the public, the union need not limit its pickets to that location. If the union can reasonably be expected to picket at another location, separated from the neutral gate but close to the situs, that affords reasonable public exposure, neutral gate picketing may nonetheless imply an unlawful secondary motive. If, however, no such location is available, the Board cannot infer a violation of the secondary boycott provisions from the bare fact that a union pickets the neutral gate.[6]

 The record in this case does not reveal whether Local 501 could have reached the general public without placing its pickets at the reserved neutral gate.[7]

5. The board has occasionally indicated that the "reasonably close" to the situs standard implies that unions have an independent duty to minimize the impact of any common situs picketing on neutral employers and employees. *See, e.g., Crystal Palace,* 116 N.L.R.B. at 859; *Markwell & Hartz,* 155 N.L.R.B. at 324. Although neither the Board nor the ALJ applied any minimization of impact principle to this dispute, we note that the *Sharp & Tatro* approach requires a union to limit its picketing to primary employees and the public, where possible, and will therefore force the union to take reasonable measures to minimize the impact of common situs picketing on neutrals. *Cf. Markwell & Hartz,* 155 N.L.R.B. at 323–25 (noting that the *Moore Dry Dock* standards are intended to serve the "dual congressional objectives" underlying the secondary boycott provisions by forcing unions to take "reasonable precautions to prevent enmeshment of neutrals").

6. Our holding does not impose any duty on a *neutral employer* to establish the reserved gates so as to maximize or even facilitate a union's ability to reach the public. *See* Brief for Respondent at 13 (raising this possibility). The secondary boycott provisions, of course, do not *require* employers to take steps aimed at insulating a primary labor dispute. Where a general contractor has established a reserved primary gate virtually hidden from public view, however, we hold that the Board cannot presume unlawful secondary intent from neutral gate picketing without considering whether the union had access to a reasonable alternative public location.

7. The general counsel urges that Local 501's failure to picket Pond's corporate headquarters in downtown Stamford, Connecticut is highly suggestive of an intent to enmesh neutrals in its

Conceivably, for instance, the union might have stationed pickets at some point on Laurel Road reasonably close to the construction site but separated from the neutral gate. *See supra* pp. 890–91. We cannot tell, however, whether it was physically possible or practical to do so, or whether the union could have thereby gained reasonable access to the public.[8] The Board will have to develop further those facts in order to determine whether the union's neutral gate picketing indicates an unlawful intent to enmesh neutrals. On remand, the Board is also free to consider and weigh the other aspects of Local 501's overall conduct in this case indicative of its intent. The union's picket sign, for example, was exclusively directed to Pond employees and the public, and it specifically

disavowed any intent to embroil neutral employers in its labor dispute. *See ALJ Opinion* at 5–6. The union also presented evidence that it picketed the reserved primary gate in good faith until it was clear that it would not reach the public and began picketing the neutral gate only on advice of counsel. *See* Stip. ¶¶ 4–5, 10–12. The ALJ also expressly found that the pickets did not in any way interfere with, speak to, or, except by their presence, otherwise induce a secondary work stoppage. *See ALJ Opinion* at 6. This evidence is certainly relevant in determining whether the totality of the circumstances surrounding the union's conduct indicates an illicit secondary motive. *See, e.g., Hoff,* 642 F.2d at 1276–77; *Southern Sun,* 237 N.L.R.B. at 829–31.[9]

area standards dispute. Had the union sincerely wished to publicize its dispute with Pond, this argument goes, it would have picketed the more "visible" downtown location. *See ALJ Opinion* at p. 9 (noting but not relying on this argument). We do not believe that Pond's downtown office could constitute a reasonable alternative picketing location under the circumstances of this case. The union's area standards grievance was specifically directed at the presence of Pond employees on the St. Luke's construction project; it sought to publicize that St. Luke's was completing its construction with a firm that allegedly paid below standard wages. The union had a legitimate interest in conveying this grievance to the affected community at the jobsite itself and it cannot be deprived of its intended audience simply because it might also have picketed in some other city. We cannot accept the proposition that a "situs" can be "relocated" if the primary employer establishes a corporate headquarters at a location miles away from the job site. *Cf.* Sales Drivers, *Local 859 v. NLRB,* 229 F.2d 514, 519 (D.C.Cir.1955) (noting that "the fact of concerted activity at a common situs where one not common was available" does not itself establish a secondary boycott violation), *cert. denied,* 351 U.S. 972, 76 S.Ct. 1025, 100 L.Ed. 1490 (1956).

8. The general counsel and the charging party bear the burden of proving a secondary boycott violation, *see* 29 C.F.R. § 101.10(b) (1984), and thus presumably bear the burden of demonstrating that the union failed to avail itself of a reasonable and appropriate picketing location other than the neutral gate under the circumstances of this case. Here, the general counsel did not produce evidence that the union could have picketed at an alternative public location. *Cf.* Reply Brief for Petitioner at 6 (asserting that the neutral gate was the only safe and practical

location at which the union could reach the public). Accordingly, we could hold that the Board's conclusion that the union indicated an unlawful secondary intent by picketing the neutral gate was not based on substantial evidence. Given the novelty of the legal issues involved in this case, however, we think it more appropriate to allow the Board to determine the availability of alternative reasonable picketing sites and to judge the union's conduct on the basis of that additional evidence.

9. Local 501 also argues that the reserved gate system established in this case independently violated the first amendment because picketing the reserved primary gate subjected the union to criminal prosecution under a Connecticut criminal statute that proscribes "residential labor picketing." The statute provides that

No person shall engage in picketing before or about the home or residence of any individual unless such home or residence is adjacent to or in the same building or on the same premises in which such person was employed and which employment is involved in a labor dispute.

Conn.Gen.Stat. § 31–120 (1982). Because the reserved primary gate was located near the residence of the headmaster of St. Luke's, the union urges, its attempt to reach Pond's employees created possible liability under the statute.

However, section 31–120 has been construed to prohibit only labor picketing conducted before a residence not located at the locus of a labor dispute. In *DeGregory v. Giesing,* 427 F.Supp. 910 (D.Conn.1977), a three-judge district court rejected a facial constitutional challenge to the statute in part because it concluded that "[s]ection 31–120 does not prohibit labor picketing in a residential area when the locus of the

IV.

For the foregoing reasons, we set aside the Board's conclusion that Local 501 violated the secondary boycott provisions of the Act and remand for further factfinding and consideration. On remand, the critical question will be whether the union could practically have placed its pickets at a location near the job site both reasonably exposed to public view and reasonably separated from the neutral gate. If the union could have done so, the Board may treat the union's neutral gate picketing as an indication of an unlawful secondary motive. If this option was not available, however, we hold that the union's neutral gate picketing cannot alone support a finding of impermissible secondary intent. The Board, of course, may nonetheless conclude that Local 501's overall conduct indicated a secondary boycott violation. Any such determination, however, must rest on a detailed evaluation of the totality of the surrounding circumstances and not on the presumption of illicit intent ordinarily generated by a violation of the third *Moore Dry Dock* standard as evidenced by a union's decision to picket a reserved neutral gate.

*So Ordered.*

labor dispute is also in the residential area." *Id.* at 913; *see also Carey v. Brown,* 447 U.S. 455, 457–58 n. 1, 100 S.Ct. 2286, 2288–89 n. 1, 65 L.Ed.2d 263 (1980) (noting that section 31–120 "has been construed to permit all picketing in a residential area except for labor picketing that is not conducted at the situs of a labor dispute.") *Connecticut v. Anonymous,* 6 Conn.Cir. 372, 274 A.2d 897, 901 n. 3 (1971) (concluding that the statute was designed to prevent unions from picketing the residential homes of employers involved in labor disputes). Thus, it appears to us that the union could not have been prosecuted under the statute so construed despite the proximity of the headmaster's home. *See De-Gregory,* 477 F.Supp. at 915 ("[The statute] specifically leaves open to labor picketing the most appropriate places for communicating its message."). Indeed, there is no indication whatsoever that the union changed the location of its picketing to avoid possible liability under this statute.